# FRANK M. FORD v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY.[1]

October 3, 1913.

Nos. 18,132—(127).

**Interstate shipments — limitation of liability — statutory regulations.**

1. Under the commerce clause of the Federal Constitution, Congress may regulate the contract between the carrier and shipper as to liability for loss in interstate shipments. Until legislation by Congress the extent of the liability is determined by the application of common-law principles, or by the public policy of the particular state, or it may be fixed by statute.

[1] Reported in 143 N. W. 249.

Note.—On the question of the validity of stipulation limiting carrier's liability to agreed valuation as affected by the Hepburn Act, see note in 28 L.R.A.(N.S.) 293. And for "Carmack amendment" as affecting state regulations as to stipulations limiting liability of common carriers for the loss or damage to goods, see note in 44 L.R.A.(N.S.) 257.

For the authorities on the question of contracts fixing rates other than those established in accordance with interstate commerce act, see note in 38 L.R.A. (N.S.) 351.

**Same — Hepburn Act.**

2. By the Hepburn Act of June 29, 1906 (34 St. 584, c. 3591) Congress exercised its authority to regulate interstate shipments and the power of the state was at an end.

**Same — filed tariffs control.**

3. The schedules of fares and charges and the regulations filed with the Interstate Commerce Commission by the carrier pursuant to the provisions of the Hepburn Act are controlling between the carrier and the shipper.

**Same — loss of baggage.**

4. The schedule of fares and charges and baggage regulations filed by the carrier with the Interstate Commerce Commission fixing the limit of liability for loss of baggage bind the carrier and passenger in interstate transportation.

Action in the municipal court of Minneapolis to recover $295.75 for loss of personal effects delivered to defendant for transportation as passenger's baggage. The amended answer set out the paragraphs from defendant's schedule, filed with the Interstate Commerce Commission, which are quoted in the opinion. The answer further alleged that plaintiff, being aware of the rates and rules as set out, duly elected and agreed with defendant that the value of the baggage should not be deemed in excess of $100, and pursuant to such agreement plaintiff delivered it to defendant; and as a part of the contract defendant gave plaintiff its local duplicate baggage check No. 21,219 W, which check set forth the agreement covering the transportation of the baggage. The reply was a general denial. The case was tried before C. L. Smith, J., and a jury which returned a verdict of $150 in favor of plaintiff. From an order denying defendant's motion for a new trial, it appealed. Reversed.

*Lind, Ueland & Jerome,* for appellant.

*Henry W. Volk,* for respondent.

DIBELL, C.

This is an appeal by the defendant from an order of the municipal court of Minneapolis, denying its motion for a new trial. The action

was brought to recover the value of baggage lost in interstate transportation.

On September 20, 1911, the plaintiff bought a ticket at Colby, Kansas, over the defendant road to Albert Lea, Minnesota.   He received a baggage check designated on one side as a local duplicate check from Colby to Albert Lea, and on the reverse was the following:

"Notice to Passengers.

"This company will not be responsible for loss or damages in any sum over $100 for local baggage which consists of wearing apparel and such personal effects of passengers as may be necessary for their journey."

The defendant had at the time on file with the Interstate Commerce Commission schedules of passenger fares and charges, and baggage regulations, which stated that "150 pounds of baggage not exceeding $100 in value will be checked without charge for each adult passenger," and which also contained this provision:

"Unless a greater sum is declared by the passenger, and charges paid for increased valuation at time of delivery to carrier, the value of baggage belonging to, or checked for, an adult passenger shall be deemed and agreed to be not in excess of one hundred dollars ($100.00).   *   *   *

"If passenger, at time of checking baggage declares a greater value than one hundred dollars ($100.00)   *   *   *   each one hundred dollars ($100.00) in value, or fraction thereof, above such allowance will be charged for at ten (10) per cent of the excess baggage rate per hundred (100) pounds.   *   *   *

"Charges for declared excess valuation must be prepaid and collection must be made in cash."

The plaintiff was not informed of the schedules, nor was his attention called to the limitation of liability on the baggage check, nor was the question of value mentioned.   The case was submitted to the jury under instructions which permitted the plaintiff to recover the full value of his baggage, unless he in fact consented to the limitation, and which gave no further effect to the schedules and

rates filed. As applicable to an intrastate carriage the instructions were correct under our decisions. 1 Dunnell, Minn. Dig. §§ 1312–1319. The verdict was for $175.

1. Under the commerce clause of the Federal Constitution Congress has constitutional power to regulate contracts between the carrier and shipper in interstate shipments with respect to liability for loss or damage to property carried. Without legislation by Congress the liability is that fixed by the general common law, or that determined by the public policy of the particular state, or that fixed by the statute law of the state. Adams Express Co. v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. ed. 314; Hart v. Pennsylvania R. Co. 112 U. S. 331, 5 Sup. Ct. 151, 28 L. ed. 717; Pennsylvania R. Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. ed. 268; Chicago, M. & St. P. Ry. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. ed. 688.

2. By the Hepburn Act of June 29, 1906 (34 St. 584, c. 3591)[1] Congress took exclusive possession of the subject of interstate commerce. When Congress exercised the authority delegated it by the Constitution, the power of the state to regulate interstate shipments, either by direct legislation or by the application of common law principles, was at an end. Adams Express Co. v. Croninger, supra; Missouri, K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397; Kansas City S. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. ed. 683; Wells, Fargo & Co. v. Neiman-Marcus Co. 227 U. S. 469, 33 Sup. Ct. 267, 57 L. ed. 600; Chicago, R. I. & P. Ry. Co. v. Hardwick F. E. Co. 226 U. S. 426, 33 Sup. Ct. 174, 57 L. ed. 284; St. Louis, I. M. & S. Ry. Co. v. Edwards, 227 U. S. 265, 33 Sup. Ct. 262, 57 L. ed. 506.

In the Croninger case the court, in referring to the Carmack amendment hereinafter quoted, said [at page 505]:

"That the legislation supersedes all the regulations and policies of a particular state upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract. Almost every detail

1 [U. S. Comp. St. Supp. 1911, p. 1288.]

of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist."

3. By section 6 of the Hepburn Act (34 St. 584, c. 3591) it is provided:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares and charges for transportation between different points on its own route. * * * The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part of the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper or consignee. * * * No carrier, unless otherwise provided by this act, shall engage or participate in the transportation of passengers or property, as defined in this act, unless the rates, fares, and charges upon which the same are transported by such carrier have been filed and published in accordance with the provisions of this act; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property, or for any service in connection therewith, between the points named in such tariffs than the rates, fares, and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or

facilities in the transportation of passengers or property, except such as are specified in such tariffs."

Section 20, often referred to as the Carmack amendment [34 St. 593] provides as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed."

The rates filed with the Interstate Commerce Commission and published and posted are binding upon shipper and carrier. The Supreme Court of the United States steadily adheres to the proposition that the published and filed rates are controlling.

In Adams Express Company v. Croninger, 226 U. S. 491, 33 Sup. Ct. 148, 57 L. ed. 314, where there was involved a limitation of liability based on carriage rates, the court said [at page 506]:

"To hold that the liability therein declared may be increased or diminished by local regulation or local views of public policy will either make the provision less than supreme or indicate that Congress has not shown a purpose to take possession of the subject. The first would be unthinkable and the latter would be to revert to the uncertainties and diversities of rulings which led to the amendment."

In Kansas City S. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. ed. 683, involving a case of valuation to adjust the rate, the court said [at page 652]:

"The valuation the shipper declares determines the legal rate where there are two rates based upon valuation. He must take notice of the rate applicable, and actual want of knowledge is no

excuse. The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station. * * * The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed, and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid. Nor is the carrier liable for damages resulting from a mistake in quoting a rate less than the full published rate. Nor can a carrier legally contract with a particular shipper for an unusual service unless he make and publish a rate for such service equally open to all. * * * To the extent that such limitations of liability are not forbidden by law, they become, when filed, a part of the rate."

In Missouri, K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. ed. 690, involving a limitation of liability, the court said [at page 671:]

"When the carrier graduates its rates by value, and has filed its tariffs showing two rates applicable to a particular commodity or class of articles, based upon a difference in valuation, the shipper must take notice, for the valuation automatically determines which of the rates is the lawful rate."

In Wells, Fargo & Co. v. Neiman-Marcus Co. 227 U. S. 469, 33 Sup. Ct. 267, 57 L. ed. 600, where a shipper accepted a receipt but did not value the shipment, and was not asked its value, the court said [at page 476:]

"But the shipper, in accepting the receipt reciting that the company 'is not to be held liable beyond the sum of $50, at not exceeding which sum said property is hereby valued, unless a different value is hereinabove stated,' did declare and represent that the value did not exceed that sum, and did obtain a rate which he is to be assumed to have known was based upon that as the actual value. There is no substantial distinction between a value stated upon inquiry, and one agreed upon or declared voluntarily. The rate of freight was based upon the valuation thus fixed, and the liability should not exceed the amount so made the rate basis."

Every charge for service incident to the shipment must be stated in the schedules and carrier and shipper are bound thereby. There can be no deviation.

The inconsistencies and diversities of rulings in state and Federal courts influenced Congress in establishing uniformity and certainty of obligation and liability. The following language of the court in Southern Pacific Co. v. Crenshaw, 5 Ga. App. 675, 687, 63 S. E. 865, is approved in the Croninger case [226 U. S. 505] as descriptive of the situation before the final action of Congress:

"Some states allowed carriers to exempt themselves from all or a part of the common law liability, by rule, regulation, or contract; others did not; the Federal courts sitting in the various states were following the local rule, a carrier being held liable in one court when under the same state of facts he would be exempt from liability in another; hence this branch of interstate commerce was being subjected to such a diversity of legislative and judicial holding that it was practically impossible for a shipper engaged in a business that extended beyond the confines of his own state, or for a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one state to another. The congressional action has made an end to this diversity; for the national law is paramount and supersedes all state laws as to the rights and liabilities and exemptions created by such transaction. This was doubtless the purpose of the law; and this purpose will be effectuated, and not impaired or destroyed by the state court's obeying and enforcing the provisions of the Federal statute where applicable to the fact in such cases as shall come before them."

There may be in the cases an occasional reversion to phraseology appropriately descriptive of the legal liability of carrier to shipper as it was prior to the Hepburn Act. Still there is a steady adherence to the proposition that the rates filed with the commission are law to carrier and shipper.

4. The remaining question is whether the schedule of fares and

charges and the baggage regulations filed by the carrier with the Interstate Commerce Commission bind the carrier and passenger as the freight schedules bind the carrier and shipper.

The rules of the Interstate Commerce Commission under which the schedules and provisions relative to passenger tariffs and baggage are filed contain the following:

"These rules shall include the general rules governing stop-over privileges and the general baggage regulations, and also schedules of excess-baggage rates, unless such excess-baggage rates are shown in tariff in connection with the fares." Tariff Circular, 15–A, 34.

In Hooker v. Boston, 209 Mass. 598, 95 N. E. 945, Ann. Cas. 1912B, 669, the supreme court of Massachusetts held that the limitation of liability for the loss of baggage transported without extra charge was not a part of the passenger rate or tariff, but an incident subsidiary to the main matter of fare. The holding is based to a considerable extent upon Pennsylvania R. Co. v. Hughes, 191 U. S. 477, 24 Sup. Ct. 132, 48 L. ed. 268, decided prior to the Hepburn Act, and which does not state the law as it now is relative to the liability for loss or damage in interstate shipments.

The Interstate Commerce Commission by requiring the filing of baggage rates and provisions relative thereto construes the act to include baggage.

The Interstate Commerce Act refers to interstate transportation of passengers as well as to interstate transportation of freight. The same general policy applies.

We hold that the provisions relative to liability as to baggage and charges for excess baggage bind the carrier and passenger in the same way as the schedules of freight tariffs bind the carrier and shipper. And following what we understand to be the effect of the decisions of the Supreme Court of the United States we hold that there was a valid limitation of liability for loss of the plaintiff's baggage.

The result of the reversal is a new trial. It seems, however, that there is no substantial controversy over the rights of the plaintiff to judgment for $100, and interest, and costs in the lower court; and

it is not to be supposed that the parties will be put to the expense of a new trial.

Ordered reversed.

HALLAM, J. (dissenting).

I cannot concur in the foregoing opinion.

It has been held in a long line of cases in this state that a common carrier may by contract limit the amount of its liability for negligent loss of goods shipped, but that in order to uphold such a contract it must appear that the value fixed was intended as a basis for determining the freight charges and the carrier's responsibility, and that the contract was entered into in good faith. It was held that the language of the contract does not control, that it is valid only when entered into fairly and understandingly for the purpose stated, and that the question whether it was so entered into must be determined, not alone from the contract itself, but from the facts surrounding its execution. O'Malley v. Great Northern Ry. Co. 86 Minn. 380, 90 N. W. 974; Ostroot v. Northern Pacific Ry. Co. 111 Minn. 504, 127 N. W. 177; O'Connor v. Great Northern Ry. Co. 118 Minn. 223, 136 N. W. 743. These cases, to the extent that they permit a declared valuation to be overthrown by evidence *aliunde* the contract, are undoubtedly overruled by recent decisions of the Supreme Court of the United States. Kansas City So. Ry. Co. v. Carl, 227 U. S. 639, 33 Sup. Ct. 391, 57 L. ed. 683; Missouri, K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 397, 57 L. ed. 690.

It has not, however, been held by that court that, under the Federal legislation, a carrier may limit its liability for its own negligence without either a contract or acts constituting an estoppel. In Missouri, K. & T. Ry. Co. v. Harriman, 227 U. S. 657, 33 Sup. Ct. 399, 57 L. ed. 690, the latest case on this subject, it was said (page 672): "The liability imposed by the statute is the liability imposed by the common law upon a common carrier, and may be limited or qualified by special contract with the shipper, provided the limitation or qualification be just and reasonable, and does not exempt from loss or responsibility due to negligence." "The ground upon which the shipper is limited to the valuation declared is that of es-

toppel, and presupposes the valuation to be one made for the purpose of applying the lower of two rates based upon the value * * * " (p. 668). The Interstate Commerce Commission, speaking on this subject, has said: "Can it possibly be argued that when a carrier has arbitrarily placed in its bill of lading a stipulation limiting the amount of its liability, regardless of the actual value of the property, it may claim the benefit of an estoppel? Obviously not. * * * The cases which take cognizance of this fundamental difference in principle are numerous and well considered." Released Rates, 13 I. C. C. Rep. 550, 554, 555. In this case the baggage check contains simply the arbitrary statement that "this company will not be responsible for loss or damage in any sum over $100 for legal baggage." There is no semblance of a contract here. Nor do these facts give rise to an estoppel.

A shipper may be liable for rebating if he accept a less rate than the published rate, even though he do so innocently and in ignorance of the true rate, but it has never been held that the diminution of his claim for damages in case of loss is one of the penalties imposed on the shipper in such cases.